CARLSON, Presiding Justice,
dissenting:
¶ 44. The Hancock Country Chancery Court granted Stacy Carambat’s divorce from her husband, James Carambat, on the ground that he was a habitual and excessive user of opium, morphine, or other like drug,[10] where the drug in question was marihuana. This Court has never found this ground for divorce to be satisfied by marihuana use alone; nor, indeed, has any appellate court in the United States. It is my opinion that granting the divorce on this basis will dramatically expand this ground for divorce far beyond the language of the statute, effectively legitimizing divorce based on the use of any illegal drug. Because I believe that the majority’s opinion goes far beyond the intent of the Legislature and creates new law, I must respectfully, but fervently, dissent.

I. Nature of the Appeal

¶ 45. James argues that marihuana is not a like drug to opium or morphine. There is no relevant caselaw from Mississippi granting a divorce on this ground for the abuse of marihuana alone. Indeed, both parties, as well as the judge, conducted searches for persuasive precedent from all U.S. jurisdictions. Their research, and my own, indicate that no appellate court in the United States has ever granted a divorce based on marihuana use alone, or indeed has ever faced this question.[11] This is a novel issue, and one that the chancery court specifically intended for us to consider. Accordingly, I respectfully believe we must thoroughly address this issue.
¶ 46. The chancery court in the initial case adjudicated that marihuana was a like *515 drug to opium and morphine, but granted James leave to petition us for an interlocutory appeal. The chancellor explained that the relevant substances were alike in that they were habit-forming, mood-altering or hallucinogenic, and illegal. However, the chancellor did not enter a formal order granting James’s request for appeal, and James did not file a petition for interlocutory appeal with this Court, due to what he later claimed was a misunderstanding. The chancellor rendered final judgment. On motion for rehearing or to amend judgment, the chancellor offered James another opportunity for an interlocutory appeal, and Stacy’s counsel indicated that they were amenable to this procedure.
¶ 47. James’s counsel considered taking the proffered interlocutory appeal option in discussions in open court, but decided that “an interlocutory appeal may result in multiple trips to the Supreme Court when one only may really be necessary on the issue that we want to get before them ... we would withdraw our request for an interlocutory appeal.” Final judgment and this direct appeal followed, but the urgency of fully addressing the issue remains. As the chancellor stated, “the fact is, it’s one of those things that needs to be clarified in the Mississippi Supreme Court.”

II. Standard of Review

¶ 48. “We review a chancellor’s legal conclusions de novo; that is, we reach our own conclusions as to the applicable law.” Bluewater Logistics, LLC v. Williford, 55 So.3d 148, 155 (Miss.2011). “But we ordinarily accept a chancellor’s factual findings unless — given the evidence in the record— we conclude that the chancellor abused his or her discretion, and no reasonable chancellor could have come to the same factual conclusions.” Bluewater Logistics, LLC, 55 So.3d at 155. Thus, we will not disturb a chancellor’s findings of fact when supported by substantial evidence, unless the chancellor abused his or her discretion, was manifestly wrong, was clearly erroneous, or applied an erroneous legal standard. Limbert v. Miss. Univ. For Women Alumnae Ass’n, Inc., 998 So.2d 993, 998 (Miss.2008) (quoting Hamilton v. Hopkins, 834 So.2d 695, 699 (Miss.2003)). In a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within the chancellor’s sole province. Sproles v. Sproles, 782 So.2d 742, 746 (Miss.2001).

III. Illegality

¶ 49. Before addressing our standard as to what drugs are like opium and morphine, I must address an alternate standard, illegality, that, in my opinion, the chancellor mistakenly invoked. On motion for rehearing to amend the judgment, Stacy’s counsel argued that “the question about whether or not marijuana falls within the statute ... can best be explained by looking at the fact that the mere possession of marijuana is illegal in this state.” The chancellor stated that “the fact that the children are exposed to the dad getting away with this illegal act, in my judgment, contributes to the delinquency of minors .... Mr. Carambat is setting an example for his children, and this Court has to find some way of overcoming that.”
¶ 50. Respectfully, I believe the chancellor homed in on the wrong grounds for considering whether marihuana is a like drug to opium and morphine. The “opium, morphine, or other like drug” ground for divorce entered the Mississippi Code in 1892. Deborah H. Bell, Mississippi Family Law § 4.02[7] (2005), Miss.Code Ann. § 1562 (1892). At that time, neither possession, distribution, nor use of opium and morphine was illegal in the State of Mississippi. Indeed, in perusing the 1892 code, only two crimes related to that drug can *516 be found. It was a misdemeanor to sell morphine in a container without a scarlet label with white letters, and it was similarly a misdemeanor to sell morphine to any customer who did not have a physician’s certifícate. Miss.Code Ann. §§ 1213, 1214 (1892). Violation of either statute by the druggist was punishable by a fine of between ten dollars and fifty dollars.
¶ 51. Even if this Court analyzes the status of opiates and marihuana today, the two substances are not legally alike. Marihuana possession is still regulated in Mississippi, but in a special section involving lighter penalties than those prescribed for all other scheduled substances. Possession of thirty grams or less of marihuana is penalized, for a first offender, with a fine of between $100 and $250. Miss.Code Ann. § 41 — 29—139(c)(2)(A) (Rev.2004). James bought approximately one quarter ounce of marihuana a month — -just over seven grams. The offense is not considered a misdemeanor and entails no jail time. In comparison, possession of even less than one tenth of a gram of any controlled substance classified in Schedule I or II, except marihuana, may be charged as either a misdemeanor or a felony, and may entail a fine of up to $10,000 and prison time of up to four years. Miss. Code Ann. § 41-29-139(c)(l)(A) (Rev. 2004).
¶ 52. Regardless of the legal status of marihuana, granting a divorce based on illegal conduct is not in the spirit of the common law. An instructive analogy can be made to the legal problem that was resolved by modern slayer’s statutes, like that Mississippi has enacted. Miss.Code Ann. § 91-1-25 (Rev.2004). At common law, many courts held that one who murdered a decedent was still eligible to inherit property from him.[12] See e.g., In re Duncan’s Estates, 40 Wash.2d 850, 854, 246 P.2d 445, 447-48 (1952). The law held that the remedy for murder was criminal prosecution, not disinheritance. Similarly, the possession and use of marihuana is certainly criminalized in Mississippi. Whether such use may be grounds for a divorce is another question entirely.

IV. Precedent

¶ 53. This Court must consider whether marihuana is a like drug to opium and morphine. In construing the statute, it must be given its ordinary meaning. Mississippi Code Section 1-3-65 (Rev.2005) provides that “all words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning....”
¶ 54. In Lawson v. Lawson, 821 So.2d 142, 145 (Miss.Ct.App.2002) the Court of Appeals held that, in determining whether a drug is an “other like drug” under Section 93-5-1, “[so] far as the kind of drug is concerned, chemical content is not important, but effect caused by use is the test.” Id. at 145 (quoting Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss.1983)) (emphasis in original). In Ladner, this Court set forth factors to consider: “[S]uch factors as the guilty spouse’s inability to support his wife and family or to properly attend to business should be considered. Additionally, the guilty spouse’s incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse are equally important.” Id. at 1375.
¶ 55. Two prior cases are relevant to this analysis. In Ladner, the spouse deceitfully obtained numerous prescription drugs and abused them for four years, exceeding the prescribed dosage. The spouse’s drug use negatively affected his attitude, actions, work habits, and family *517 and social relationships. The wife testified that her husband was hyperactive in the morning (after taking Ritalin) and practically immobile in the evening (after taking tranquilizers). He worked only two days per week, ceased communicating with friends, squandered his son’s savings account, and took many valuable items from the home. Ladner, 486 So.2d at 1369.
¶ 56. In another Court of Appeals case, the wife abused prescription drugs throughout the marriage. Ashburn v. Ashburn, 970 So.2d 204, 207 (Miss.Ct.App.2007). She once left home and did not return for six weeks. Id at 207. She forged her husband’s name on checks and stole someone else’s prescription. Id. at 208. The wife’s drug use increased to the point that she started obtaining three month’s worth of pills in one month through her husband’s insurance coverage, and in one instance, two witnesses observed her overdosing on pills. Id.

V. Effect of the Drug

A. Physical Effect
¶ 57. I first wish to address the effect of marihuana usage, which, this Court has held to be the key determinant in finding that a drug is sufficient for this ground for divorce. See Lawson, 821 So.2d at 145, Ladner, 436 So.2d at 1375. While the chemical content of the like drug is irrelevant, I would hold that the physical or physiological effect of the drug was meant to be considered in the Ladner effect test.
¶ 58. In Ladner, this Court found “a physical effect [on the husband] similar to morphine or opium.” Ladner, 436 So.2d at 1375. Furthermore, if “effect” and thus “like drug” mean no more than work productivity, marital duties, and repugnancy of the marriage, the term would become synonymous with the “excessive” standard already incorporated into the test. As a result, I have analyzed the physical effects of marihuana and find it to be unlike opium and morphine as a matter of law.
¶ 59. For information on the effects of marihuana, and of the most commonly utilized opiates, I consulted the Research Report Series of the National Institutes of Health’s National Institute on Drug Abuse.[13]
¶ 60. Marihuana, per this resource, is ingested to cause the user to feel a euphoria or “high” by stimulating brain cells to release the chemical dopamine — a phenomenon also associated with most drugs of abuse, as well as alcohol, tobacco, chocolate, and sexual activity. Acute dangers associated with marihuana intoxication include short-term memory loss, impaired attention and judgment, increased heart rate and blood pressure, decreased coordination and balance, and occasionally feelings of anxiety, distrust, or panic. Cumulative use may lead to addiction, though it is considered less addictive than “hard” drugs.
¶ 61. The following information is also gleaned from the Research Report Series of the National Institutes of Health’s National Institute on Drug Abuse. The most commonly used opiate in the United States today is heroin. Heroin is severely addictive, and withdrawal can cause painful physical symptoms, including vomiting and bone pain. Since users are typically unaware of the amount and purity of the drug they are using, the drug can lead to nearly instantaneous death upon use. In the brain, the heroin converts to morphine and binds rapidly to opioid receptors, triggering a surge of pleasurable sensation called a “rush.” Several drug analogs to *518 opium have been produced, some by pharmaceutical companies for medical reasons, but others, known as “designer drugs,” by illegal laboratories. This latter category may be more dangerous than the original compound. Several of the most abused prescription drugs are also opioids, commonly prescribed because of their pain-relieving properties. These opioids, such as OxyContin, also produce euphoria as a side effect. Withdrawal leads to the same physical symptoms caused by heroin withdrawal, and a large enough dose of these drugs may lead to death. Id.
¶ 62. The effect of marihuana is unlike the effect of opiates. The only real similarities between the drugs appear to be the euphoric rush or high associated with their use, and the addiction. Neither of these features is alike in degree. Marihuana, according to the Research Report Series of the National Institutes of Health’s National Institute on Drug Abuse, never leads to immediate death, lacks physical withdrawal symptoms, and is much less addictive than opium. While this resource indicates that marihuana clearly leads to decreased activity in the abuser, holding that marihuana is like an opiate on these grounds is analogous to holding that caffeine is like cocaine.
¶ 63. Our state’s caselaw on this issue, scant though it is, has been dominated by the abuse of prescription drugs including opiates, and without exception, a divorce has been granted only when individuals were much more severely incapacitated than James was in this case. See Ladner, 436 So.2d at 1375 (spouse abused prescription drugs including barbiturates, amphetamines, Dalmane, Librium, Ativan, Nolun-dar, Mellaril, Sinequan, Vivactil, Talwin, and Tylenol No. 3 with Codeine, which constituted opium, morphine, or other like drug); Smithson v. Smithson, 113 Miss. 146, 74 So. 149, 150 (1917), modified on suggestion of error, 113 Miss. 644, 74 So. 609 (1917) (unspecified “drugs to palliate her physical pains to such an extent and period of time that she became an habitual and excessive user of these insidious drugs .... ” constituted opium, morphine, or other like drug); Ashburn v. Ashburn, 970 So.2d at 209-10 (Miss.Ct.App.2007) (morphine prescribed by a physician, abuse of prescription drugs including Lortab, Effe-xor, Lithium, Neurontin, Klonopin, and OxyContin, as well as abuse of hydroco-done and marihuana, together constituted opium, morphine, or other like drug); and Lawson, 821 So.2d at 145 (abuse of the prescription drugs Darvocet-N, Lortab, hydrocodone, and Tylenol No. 3 with Codeine constituted opium, morphine, or other like drug).
¶ 64. With this caselaw in mind, in today’s case, James was able to function on a relatively normal level while abusing marihuana, hardly a behavior associated with abusers of drugs as depicted in the cases cited in the preceding paragraph.
¶ 65. In addition, given the unfortunate prevalence of marihuana in American society, it is a dangerous precedent to allow divorce for marihuana use alone. As already revealed, marihuana is considered to be a relatively mild drug, and remains the least regulated of all illegal drugs in the State of Mississippi. Marihuana is less addictive, less immediately dangerous, and less incapacitating than the major opiates, and indeed than most other illegal drugs. Allowing a divorce based on marihuana abuse will effectively hold that divorce is available for the abuse of any drug — which is not a natural reading of “opium, morphine or other like drug.”
¶ 66. To be sure, marihuana abuse, like alcohol abuse, has the propensity to destroy a marriage. However, the Legislature has not seen fit to provide for divorce on such grounds, and it is not this Court’s *519 responsibility to create new grounds for divorce ex nihilo. In my opinion, the natural meaning of “opium, morphine or other like drug” is not so broad as to cover marihuana. Accordingly, I would find that the chancery court erred in granting a divorce on the ground of using “opium, marihuana or other like drug,” where the sole drug habitually and excessively used was marihuana.
B. The Ladner Factors
¶ 67. Although I would hold that marihuana, as a matter of law, is too unlike opium or morphine to satisfy the definition of a “like drug” to opium and morphine, I have considered its effects in the present case. Under Ladner, factors this Court is to consider include “the guilty spouse’s inability to support his wife and family or to properly attend to business ... [as well as] incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse.” Ladner, 436 So.2d at 1375. The chancellor’s order referenced this language and analyzed these factors, but does not specify which grounds the chancellor found to have been satisfied in finding that marihuana met the effect test as a like drug to opium and morphine. Thus, I have reviewed the evidence as to all of these factors.
¶ 68. An analogy may be drawn to habitual drunkenness, the most similar ground for fault-based divorce in Mississippi law.[14] In Culver v. Culver, 383 So.2d 817, 817-18 (Miss.1980), this Court did not find habitual drunkenness where the husband consumed four or five beers a night, without significant impact on his family or work. It must be recognized that divorce is not to be granted under these two fault-based grounds due to the mere fact that the husband abused alcohol or opiates and like drugs, but only due to the effect that these substances might have on the marriage.
¶ 69. Here, even assuming arguendo that marihuana is not an unlike drug to opium and morphine as a matter of law, the effect of the marihuana abuse was minimal. In my opinion, the chancellor abused his discretion in finding that James was a habitual and excessive user of opium, morphine, or other like drug, thus justifying granting a divorce to Stacy on this ground. The evidence indicates that marihuana usage at worst marginally affected James’s business life and did not substantially harm James’s relationship with his children. While James’s relationship with his wife Stacy sharply declined, the evidence does not indicate that James’s marihuana usage was responsible for this deterioration.
1. Marital Duties and Repugnance
¶ 70. As the majority recognizes, James’s marihuana abuse was in no way comparable to the facts of Ashbum or Ladner. James did use the drug almost daily for more than forty years. Stacy testified that James’s routine was to come home from work, smoke marihuana, and wait for her to prepare dinner. He would then isolate himself on the couch or in the computer room and sometimes come to bed late after staying awake to use the computer or watch television. James testified that he withdrew from his wife because she had withdrawn from him sexually after their children were born, in 1999, ten years before this divorce action was filed. Stacy admitted that she had withdrawn from James on an intimate level at that time.
¶ 71. Stacy testified that James had remained involved in their children’s lives, taking them to church, helping them with *520 their homework, and participating in their social activities, particularly fishing, sporting events, and shooting “bb” guns. Stacy complained that he came to only a few school activities, such as parent-teacher conferences. James did attend events with his wife’s family less frequently and with Stacy’s mother, Barbara Ruth in particular, stating that he became disinterested in these family events about three years before these proceedings began. James testified that this was because he did not like his wife’s family.
¶ 72. On the whole, James’s relationship with his inlaws is far less significant in divorce proceedings than his relationship with his children and with his spouse. The evidence is clear that James’s relationship with his children remained strong and healthy. In contrast, his relationship with Stacy clearly declined. However, this decline was due to reasons other than the marihuana abuse. James testified, and Stacy admitted, that she had withdrawn from him sexually ten years prior, when their children were born.
¶ 73. Stacy testified that she began dating a man named Tom Henry before filing this divorce. James suspected or became aware of Stacy’s adultery, and this affected the relationship between them. James also testified, and Stacy agreed, that Stacy never specifically asked James to stop smoking marihuana, though she claimed that his continued use exasperated her. The evidence is uncontroverted that Stacy was aware of James’s marihuana habit two years before they married. While James failed to timely plead the affirmative defense of condonation, this testimony can hardly be irrelevant to our analysis. Since Stacy married James with the knowledge that he was a heavy abuser of marihuana, and never asked him to quit, in my opinion, it was unreasonable to conclude that James’s marihuana abuse made the marriage repugnant to her.
¶ 74. James did stop performing certain marital duties, though there is no evidence that this was due to incapacity to perform them. The marriage obviously did become repugnant to Stacy. However, since Stacy had withdrawn from James sexually, engaged in an adulterous affair, and was aware of James’s marihuana use even before marriage but never asked James to quit using it, the chancellor, in my opinion, abused his discretion by holding that marihuana abuse was responsible for this state of affairs.
2. Support of Family and Attending to Business
¶ 75. There was minimal evidence that James’s marihuana use substantially affected his earning capability. Trial testimony showed that James worked every day of the marriage except for brief periods of time when he lost employment due to his job being discontinued or, in one case, his company going bankrupt after Hurricane Katrina. As the majority notes, the Carambats’ financial difficulties were primarily caused by these layoffs. Stacy was able to argue only one instance in which marihuana use affected James’s job performance: an instance where James was demoted for botching a printing job. Stacy testified that James had told her that his drug use played a part in this incident.
¶ 76. On cross-examination, Stacy was impeached with her deposition, in which she was questioned about the demotion. Stacy admitted that, to her knowledge, James’s demotion was not caused by, and was never connected to, James’s drug use. When specifically asked whether this work incident was due to a mistake or a result of James’s drug use, Stacy answered that it was a mistake. The evidence does not show that, by smoking marihuana, James’s work productivity was affected. The majority finds that James’s marihuana use *521 did affect his work productivity, but solely based on James’s demotion, which the evidence does not show was based on James’s marihuana usage. A statement by Stacy, later contradicted on cross-examination, that James had stated to her that his demotion was based on his drug use, is insufficient to show that James’s drug use caused him to fail to attend to his business or support his family.
¶ 77. Stacy admitted that James’s expenditures on marihuana were a minimal portion of the family income — approximately $300 annually out of a combined annual income of approximately $70,000. James’s expenditures on marihuana may have been wasteful, but a $300-a-year habit for a family with an annual income of $70,000 is hardly grounds for a divorce.
¶ 78. James’s abuse of marihuana was heavy, but there is minimal evidence that his family or work was impacted. James’s admittedly wasteful spending on the marihuana was minor, and only one incident was reported indicating that James had failed to attend normally to business as a result of his drug use, and the only testimony concerning this one incident was successfully impeached by prior testimony. There was also uncontested evidence that the main cause for the decline in the family income was linked to events outside James’s control, as the majority opinion concedes. After consideration of these factors, I conclude that it was an abuse of discretion for the chancellor to find that James’s use of marihuana met the effect test as a like drug to opium and morphine.

VI. Suggested Disposition and Future Proceedings

¶ 79. For these reasons, I respectfully dissent from the majority and would reverse and remand for further proceedings. I recognize that remanding this case after a divorce has been granted would be an unfortunate step. The obvious effect is that James and Stacy would continue to be bound together, unhappily, in matrimony. However, from the record before us, it is abundantly apparent that, on remand, the parties would have alternate grounds for divorce to consider. Admittedly, this Court is not in the business of issuing advisory opinions, so I go no further as to what might or might not happen if this case were remanded.
¶ 80. However, in sum, I conclude that it was error for the chancery court to find that James was a habitual and excessive user of opium, morphine, or other like drug. If the Legislature wishes to provide for divorce on the grounds of abusing any illegal drug, or any dangerous drug, it of course may do so. To date, however, it has not. What the Legislature has provided is that parties may seek a divorce on the grounds of “[hjabitual and excessive use of opium, morphine or other like drug.” Miss.Code Ann. § 93-5-1 (Rev. 2004). Because marihuana is unlike opium or morphine, both in physical effect and in its effect on family life, I would reverse and remand. Because the majority finds otherwise, I respectfully dissent.
DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.

. Miss.Code Ann. § 93-5-1 (Rev.2004).

. However, marihuana use has played a part in analysis of an alternate divorce ground, “habitual cruel and inhuman treatment.” See, e.g., Boutwell v. Boutwell, 829 So.2d 1216, 1220 (Miss.2002).

. Other courts disagreed, holding that one should not profit from an injustice.

. National Institute on Drug Abuse, Research Report Index http://www.nida.nih.gov/ researchreports/researchindex.html, (last accessed Oct. 18, 2011).

. Professor Bell draws this analogy in considering these two grounds for divorce. Deborah H. Bell, Mississippi Family Law § 4.02[6] (2005)